**10 CV      4515**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **JOHNSON INVESTMENT COUNSEL, INC., Individually and on Behalf of All Others Similarly Situated,** : | **Civil Action No:** _____ |
| : | |
| **Plaintiff,** : | **Judge:** _____ |
| **vs.** : | |
| : | **CLASS ACTION COMPLAINT FOR** |
| : | **VIOLATIONS OF FEDERAL** |
| **TRANSOCEAN LTD. and STEVEN L.** : | **SECURITIES LAWS** |
| **NEWMAN and ROBERT A. LONG** : | |
| : | **JURY TRIAL DEMANDED** |
| **Defendants.** : | |
| : | |

**RECEIVED**
**JUN 0 8 2010**
**U.S.D.C. S.D. N.Y.**
**CASHIERS**

## I.      INTRODUCTION

1.      This is a securities fraud class action on behalf of the purchasers of the publicly-traded common stock of Transocean Ltd. ("Transocean" or the "Company") from August 5, 2009 to June 1, 2010(the "Class Period"), who were damaged thereby.  Throughout the Class Period, Defendants violated §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder by disseminating false and/or misleading statements and material omissions about the Company's safety protocols, the nature and correction of design issues, recurring blowout preventer ("BOP") problems, and the Company's operating and safety record.

2.      Transocean is the world's largest offshore drilling contractor and the leading international provider of drilling management services for oil and gas wells.  It has a fleet of 141 mobile offshore drilling units.  Transocean designed, owned, managed, operated and controlled the ultra-deepwater dynamic-positioned, semi-submersible mobile oil drilling rig called *Deepwater Horizon* (the "*Horizon*").  On or about January 30, 2010, the *Horizon* commenced a

voyage in federal waters of the Gulf of Mexico in the vicinity of Mississippi Canyon Block 727 to the vicinity of Mississippi Canyon Block 252 for the purpose of conducting contract drilling operations. On April 20, 2010, explosion(s) on the *Horizon* caused a fire that severely damaged and eventually sunk the *Horizon*, which had been drilling on the outer Continental Shelf approximately 41 miles offshore from Louisiana. At the time of the explosion, unknown to the public, drilling was being conducted at depths of 22,000 to 25,000 feet – in violation of the maximum allowed by the permits issued by the Minerals Management Service ("MMS") bureau of the U.S. Department of the Interior.

3.       As a result of the fire and the explosion on the *Horizon*, eleven crew members lost their lives, nine of whom were employees of Transocean, and seventeen others were injured. Additionally, the subsequent failure of the *Horizon's* safety mechanisms, including the BOP, led to a massive oil spill that covers an estimated surface area of at least 2,500 square miles. Early estimates were that over 5,000 barrels of crude oil – equivalent to over 200,000 gallons – were flowing from the damaged well **each day**. Current reports suggest that these estimates were woefully low, and that the actual flow could be as great as 100,000 barrels a day. The disaster threatens to become the worst oil spill in history – by some estimates, the size of the spill has already surpassed that of the 1989 Exxon Valdez oil spill. The ever-growing oil spill has caused serious and permanent environmental damage to the Louisiana coast, with detrimental effects upon the Gulf of Mexico's and Louisiana's marine environments, coastal environments and estuarine areas. Moreover, Defendants' actions and fraud have subjected the Company to significant liability, including current investigations by the U.S. Departments of Justice, Homeland Security and the Interior and various committees and subcommittees of Congress.

The Company has also been subjected to over 100 civil lawsuits related to the catastrophic disaster.

4.      During the last several years, Defendants were made aware of, but did not publicly disclose the full extent of, spills, fires and other serious incidents on the *Horizon*, which was issued citations for "acknowledged pollution source" by the U.S. Coast Guard some 18 times in the last 11 years.  Defendants also did not publicly disclose that the BOP on the *Horizon* was ten years old and had not been recalibrated, maintained, and/or tested appropriately, all of which violated federal requirements. Defendants were also apprised on several occasions of the serious hazards associated with Transocean's use of certain BOPs on ultra-deepwater drilling engagements.   Despite all of this knowledge, during the Class Period, Defendants falsely represented that Transocean had remedied its past safety problems, that the Company's BOP problems "have all been resolved," that BOP issues were "anomalies," and that the Company was closely monitoring its operating and equipment and conducting its operations in a safe and sound manner.   Defendants failed to disclose material information concerning Transocean's repeated safety failures and recurring BOP issues and concealed that the Company had not in fact eliminated BOP issues or rectified the prior BOP failures.  As a result of Defendants' false and misleading statements, Transocean's common stock traded at artificially inflated prices during the Class Period, reaching a high of $94.88 per share on January 11, 2010.

5.      As the truth about the extent of the disaster and the falsity of Defendants' previous statements and material omissions was absorbed by the market over the two weeks following the explosion and oil spill, Transocean shares fell $25.69 per share, closing at $66.34 per share on May 10, 2010.   As further truths about Defendants misconduct came to light, Transocean shares fell further, closing at $50.04 per share on June 1, 2010.

6.     As a result of Defendants' violations of federal securities laws, Plaintiff and the other members of the class have been damaged by purchasing Transocean common stock at artificially inflated prices during the Class Period and by suffering losses when the price of Transocean's common stock substantially declined after the revelations of Transocean's deficient safety protocols, defective designs, and poor safety and operating records.

## II.     JURISDICTION AND VENUE

7.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

8.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1331.

9.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b). Transocean has operations in Louisiana and many of the acts in furtherance of the alleged fraud and/or the effects of the fraud occurred within this District, including the dissemination of materially false and/or misleading information and the omission of material information.

10.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## III.   PARTIES

11.     Plaintiff Johnson Investment Counsel, Inc. is an investment adviser and acquired Transocean publicly-traded common stock as set forth in the attached certification and has been damaged thereby.

12.     Defendant Transocean Ltd. started as a Louisiana company in 1919 under the name Danciger Oil & Refining Company. After many name changes, business combinations, and other modifications (for business reasons and tax avoidance purposes), Transocean is currently a Swiss company which purports to be based in Vernier, Switzerland.   Transocean and its subsidiaries, including Transocean Offshore Deepwater Drilling, Inc. and Transocean Deepwater, Inc., do business in New York.   Transocean's common stock trades in an efficient market on the New York Stock Exchange ("NYSE") under the symbol "RIG."

13.     Defendant Steven L. Newman ("Newman") has been the Chief Executive Officer ("CEO") of Transocean since March 1, 2010, and the President since May 2008.   Newman served as Chief Operating Officer of the Company from May 2008 to November 2009.  Newman joined Transocean in 1994.  Newman received total compensation of $5.3 million in 2009 based on Transocean's purported success.  When he was promoted to CEO on March 1, 2010, his base salary was increased to $900,000 and he became eligible for a 100% bonus and long-term compensation of $5.4 million.

14.     Defendant Robert A. Long was the Chief Executive Officer and a Board member of Transocean from October 2002 until February 28, 2010.  He was President of the Company from December 2001 to October 2006, and Chief Financial Officer from August 1996 to December 2001.  Long received total compensation of over $15 million in 2009 based upon Transocean's purported success.

15.     Defendants made, or caused to be made, false and misleading statements, or omitted to disclose necessary information concerning (i) the Company's deficient safety efforts and safety violations; (ii) the heightened hazards associated with the BOPs used by the Company; (iii) the likelihood that the equipment required to drill at depths such as those encountered by the *Horizon* would render Transocean's safety protocols, including the BOPs, ineffective; and (iv) the Company's significant exposure to liability as a result of these unmitigated hazards, which caused the price of Transocean common stock to be artificially inflated during the Class Period.

## IV.    BACKGROUND

16.     Transocean purports to be the world's largest offshore drilling contractor with operations around the globe.  There are many different types of platforms for offshore drilling activities, from shallow-water steel jackets and jackup barges, to floating semi-submersibles and drillships able to operate in very deep waters.  Recently, Transocean has shifted its focus toward deepwater and ultra-deepwater drilling. Transocean's fleet of drilling units consists of 44 High-Specification Floaters (Ultra-Deepwater, Deepwater and Harsh Environment semi-submersibles and drillships), 13 of which are located in the Gulf of Mexico.

17.     The Company also provides oil and gas drilling management services and drilling engineering and drilling project management services, and participates in oil and gas exploration and production activities.  Drilling management services are provided through Applied Drilling Technology Inc., the Company's wholly owned subsidiary, and through ADT International, a division of one of the Company's U.K. subsidiaries (together, "ADTI"). ADTI conducts drilling management services primarily on either a day-rate or a completed-project, fixed-price, or "turnkey," basis.  Transocean's oil and gas properties consist of exploration, development and

production activities. As part of its mission statement, Transocean purports to adhere to a "safety vision," to wit: "Our operations will be conducted in an incident-free workplace, all the time, everywhere."

## A.   Blowout Preventers and Transocean's Maintenance and Safety Problems

18.    Each drilling rig is supposed to be equipped with safety mechanisms, including a blowout preventer, which serves as the failsafe. A blowout preventer, or "BOP," is a five-story-tall, 900,000-pound concrete contraption that has always served as a critical "failsafe" backstop for an offshore oil rig's valve at the top of a well that may be closed if the drilling crew loses control of formation fluids. By closing this valve, the drilling crew usually regains control of the reservoir, and procedures can then be initiated to increase the mud density until it is possible to open the BOP and retain pressure control of the formation. BOPs come in a variety of styles, sizes and pressure ratings. Some can effectively close over an open wellbore, some are designed to seal around tubular components in the well (drillpipe, casing or tubing) and others are fitted with hardened steel shearing surfaces that can actually cut through drillpipe. Because BOPs are critically important to the safety of the crew, the rig, and the wellbore itself, BOPs are supposed to be inspected, tested and refurbished at regular intervals determined by a combination of risk assessment, local practice, well type, and legal requirements. BOP tests vary from daily function testing on critical wells to monthly or less frequent testing on wells thought to have low probability of well control problems.

19.    Since before the start of the Class Period, Transocean has been aware of but has not fully disclosed to the public the problems associated with the BOPs used on its rigs, and the ineffectiveness of the BOPs. For example, in June 2000, BP issued a "notice of default" to Transocean over problems with a BOP on the Company's *Discover Enterprise* rig. At the time,

Transocean acknowledged that its BOP did "not work exactly right," and the *Discover Enterprise* was unable to operate for extended periods while the problem was purportedly resolved. The *Discover Enterprise* BOP was made by Hydril, now owned by General Electric's oil and gas arm, and Cameron International, a Houston company. Cameron also made the BOP on Transocean's *Horizon* rig, whose BOP was fitted in 2000 – approximately the same time BP issued this "notice of default."

20.    In a 2003 report titled "Deepwater BOP Control Systems – A Look at Reliability Issues," co-authored by the then-director of technology development for Transocean, Earl Shanks, and presented at the 2003 Offshore Technology Conference in Houston, Texas, a warning was issued that the industry was not taking the time necessary to find and fix the problems that commonly plagued BOPs. According to the 2003 Report, the offshore exploration and production industry was so focused on drilling that it was willing to pay higher maintenance costs to keep rigs operating and avoid downtime rather than address some of the fundamental problems with the BOPs. "Floating drilling rig downtime due to poor BOP reliability is a common and very costly issue confronting all offshore drilling contractors," the 2003 Report noted, adding that every major disruption could cost $1 million. The 2003 Report said the reliability issues were directly related to the fact that drilling companies did not have detailed design and functional specifications to give BOP manufacturing companies. The BOPs were being rushed into the field with limited testing, and if one malfunctioned, the pressure to keep drilling meant it was fixed with little time spent trying to figure out what had caused the malfunction. According to the 2003 Report:

> Because of the pressure on getting the equipment back to work, root cause analysis of the failures is generally not performed. In many operations, high maintenance is accepted as a necessary evil to prevent downtime.

High maintenance can be a tool to reduce failures in operation. However, this is a very expensive approach, and it is also an opportunity to introduce human error into the system. Also, this method does not establish reliability based on a failure rate.

In general, operating reliability is maintained on rigs mostly through regular maintenance intervals rather than specifying a reliability of a system or component to minimize maintenance.

21.     On August 24, 2005, Great Britain's Health and Safety Executive ("HSE") issued a notice to Transocean for failing to ensure that a rig's BOP was properly maintained:

Failed to ensure that all plant provided in compliance of these Regulations, namely your Driller's Remote Blow Out Preventor control panel, was maintained in an efficient state, efficient working order and in good repair.

22.     Similarly, in June 2006, the HSE cited Transocean for problems and deficiencies related to Transocean's BOP testing:

The multi-purpose tool used in blow-out preventer pressure testing was not so constructed as to be suitable for the purpose for which it was provided, and failed in service, exposing persons to risks that endangered their safety on 29th April 2006.

23.     In June 2008, a paper co-authored by Jeff S. Shepard, manager of Transocean's "Subject Matter Team," and titled "Ultradeep Drilling Pushes Drillstring Technology Innovations," was published in the Society of Petroleum Engineers *Drilling & Completion*. The paper cautioned that "BOP shear rams may also have difficulty shearing today's high-strength, high-toughness drillpipe," explaining, in part:

**BOP Pipe Shearing**. The use of higher-strength, higher-toughness drillpipe of increased wall thickness required to absorb high tensile loading has in some cases exceeded the capacity of some BOP shear rams to successfully and/or reliably shear drillpipe. Several variables impact a BOP's ability to shear drillpipe, including:

- Drillpipe outside diameter
- Drillpipe wall thickness
- Drillpipe material strength (ultimate and yield)
- Drillpipe material toughness/ductility

- Wellbore pressure (mud-hydrostatic head and trapped well-bore pressure equal to maximum BOP working pressure)

To reduce the probability of drillstring failure, *the industry has increased its appetite for high-toughness drillpipe*. Increased material toughness/ductility provides resistance to crack propagation and often enables the material to sustain a through-wall crack without catastrophic failure, commonly known as "leak before break." . . .

*Over the past few years, it has become clear that this successful improvement to drillpipe properties has not been achieved without consequence. Several publications have presented the effects of improved-drillpipe properties on BOP shearing capabilities*. This has initiated multiple industry studies, including those performed by regulatory bodies. A consistent finding throughout all of these studies is that *drillpipe material ductility and toughness is one of the major influences to the amount of force/pressure required for shear rams to successfully and reliably shear drillpipe*.

\*        \*        \*

**Conclusions**

\*        \*        \*

5. UDD presents increased operational considerations that require attention of the well designer. BOP shearing capacity of drill-pipe and BOP pressure integrity upon drillpipe collapse are adversely affected in UD wells. Well designers should work closely with OEMs to fully evaluate the performance limits of these products in ultradeep applications.

**B.    Transocean's Deepwater *Horizon* Rig and the Gulf Drilling Operations**

24.    The *Horizon* was one of Transocean's specialized ultra-deepwater, dynamically positioned, column-stabilized, semi-submersible offshore drilling units, with a high-pressure mud pump and a water depth capability of 7,500 feet or greater.  The *Horizon* was built by Hyundai Heavy Industries in Ulsan, South Korea.  Construction started in December 1998 and the *Horizon* was delivered in February 2001.  The *Horizon* was the second rig constructed of a

class of two, although the *Deepwater Nautilus*, its predecessor, is not "dynamically positioned." Since arriving in the Gulf of Mexico, the *Horizon* has been under contract to BP Exploration.[1]

25.     In 2002, the rig was upgraded with "e-drill," a drill monitoring system through which technicians based in Houston, Texas receive real-time drilling data from the rig and transmit maintenance and troubleshooting information.

26.     While the *Horizon* did have a BOP, its BOP did not have a remote-control shutoff switch known as an "acoustic switch." Acoustic switches, used by Transocean on several of its rigs in locations such as Norway and Brazil, allow a crew to shut down a damaged well by triggering an underwater valve. The switch is used if other attempts fail, since the primary shut-off systems usually work on wells when they are out of control. It can be activated from a lifeboat if an oil platform must be evacuated.

27.     On September 3, 2009, BP announced what it characterized as a "giant" new oil discovery more than six miles deep in the Gulf of Mexico, but said it could take years to assess how much crude could actually be recovered. Because of the depth of the find and the fact that the oil and gas in the field were extremely hot and under intense pressure, BP officials noted that the extraction would require advanced wellheads with thick steel and exceptional insulation. Transocean's *Horizon* rig was contracted to drill this well.

### V.     DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

28.     Throughout the Class Period, Defendants failed to disclose the serious risks Transocean faced as a result of its ongoing utilization of deficient BOPs. Defendants also omitted to disclose that on numerous prior occasions, Transocean had been censured or

---

[1] On October 17, 2009, BP and Transocean agreed to extend the *Horizon* lease. The three-year extension was set to begin in September 2010 and would pay $544 million, or $496,800 a day, over the three-year period. By contrast, the current day rate is about $487,500.

otherwise disciplined for BOP failures and problems, and that these problems were systemic, affecting all rigs which relied on BOPs as a last line of defense against catastrophic disasters.

29.   On August 5, 2009, during the Company's second quarter 2009 earnings conference call, Defendant Newman made the following statements:

*Arun Jayaram – Credit Suisse – Analyst*

Yes, good morning. Bob, I was wondering if you could comment a little bit, at least in this quarter, about the deepwater revenue efficiency. The utilization, I guess, for all three segments was below my expectations. I was wondering if you can comment if there is any quarter-specific items that led to the lower unexpected utilization.

\*       \*       \*

[Newman:] We had a couple of human error incidents on drill floors on a couple of those rigs and we had a handful of BOP problems. Nothing that I would characterize as systemic or quarter-specific. We did a deep dive on each one of those incidents. We have identified the root causes. ***We are going back to address them in our management system so they don't happen again***. It is uncharacteristic in the second quarter. They were ***anomalies*** and I think I would just leave it at that.

*Arun Jayaram – Credit Suisse – Analyst*

Steven, any of those issues, could they impact Q3, these BOP issues that you're citing?

[Newman:] No, no, no. ***They have all been resolved*** and BOP operations are a complex part of our business. It is something we pay a lot of attention to. ***All of the BOP incidents that occurred in the second quarter have been resolved and we will continue to keep our eye closely on the performance of our subsea equipment.***

\*       \*       \*

[Newman:] [T]here are some older rigs in that fleet, but it is not really a reflection of the age of the fleet. ***The BOP problems we had were on [a] combination of modern generation and older systems. The human error – the couple of human error issues we had were really completely unrelated to the age of the rigs whose guys were working on.*** So it doesn't have a lot to do with the age of the fleet.

30.     On February 24, 2010, Defendants held a conference call to discuss the Company's fourth quarter 2009 earnings results and operations. During the call, Defendant Newman made the following statements:

*Tom Curran – Wells Fargo Securities – Analyst*

. . . In terms of where utilization came in below what you would have expected based on scheduled downtime, were there any issues remotely similar to those that occurred in the second quarter of 2009, where we had both technical problems related to BOPs as well as what was categorized as some human error problem?

[Newman:] On the Ultra-Deepwater fleet, Tom, where we were particularly focused in the fourth quarter – and that differs from where we were in the second quarter of last year, which was on the conventional Deepwater fleet. In the Ultra-Deepwater fleet, *we only had one BOP issue and one human error issue*.

We had a couple of startup issues and we had some equipment failures. But the issues in the fourth quarter were largely dissimilar from what we saw in the second quarter of last year.

*Tom Curran – Wells Fargo Securities – Analyst*

So would it be fair to say then that both the nature and the number of those issues in Q4 was more in line with what you would consider normal, whereas second-quarter 2009 was clearly abnormal?

[Newman:] Yes, I wouldn't characterize the fourth quarter of 2009 – I wouldn't characterize the performance on the Ultra-Deepwater fleet as normal, because it was below the historical revenue efficiency for that class. So I don't want to lead you to conclude that that is something we ought to expect going forward.

But we have identified the issue, the equipment failure issues. *We have addressed the BOP control issue*. And the human error issue is something we continue to focus on through our training and competency programs.

31.     On or about March 1, 2010, Transocean issued its annual Proxy Statement to shareholders in which it claimed that although its executives qualified for bonuses under the safety metrics in place, the executives were receiving no bonuses since the Company had

"incurred four fatalities with varying causes in varying regions around the world." The Proxy asserted that:

> The Committee took this extraordinary action to underscore the company's commitment to safety and to increase the incentive for executive officers to promote the goal of an incident-free workplace and, in particular, the avoidance of future fatal accidents.

32.     Transocean's executives were well compensated notwithstanding this decision to withhold bonuses, including Defendant Newman, who received total compensation of $5.3 million for 2009 and Defendant Long who receive total compensation of $15.2 million for 2009.

33.     On the evening of April 20, 2010, at around 10 p.m., the semi-submersible *Horizon* experienced one or more explosions and a catastrophic fire. The explosions and fire killed eleven people, nine of whom were Transocean employees, and injured seventeen others. Two days later, on April 22, 2010, the *Horizon* sank into the depths of the Gulf of Mexico and a five-mile long oil slick was seen shortly thereafter.

34.     On April 28, 2010, the U.S. Coast Guard disclosed that it believed that the oil pouring out of the broken well was doing so at a rate five times greater than originally estimated, and that the spill could be bigger than the 1989 Exxon Valdez spill in Alaska's Prince William Sound.

35.     On April 29, 2010, *The Wall Street Journal* revealed in a report entitled "Oil Well Lacked Safeguard Device – Officials Say Leak Grows Fivefold" that the *Horizon* lacked an acoustic switch.

36.     In response to this news, the price of Transocean shares plunged $6.32 to close at $78.51 on April 29, 2010.

37.     The next day, on April 30, 2010, on the news that U.S. Attorney General Eric Holder was dispatching a team of lawyers to New Orleans to monitor the oil spill and that the

Obama administration would vigorously enforce environmental laws, the price of Transocean dropped another $6.19 to close at $72.32. "The Justice Department stands ready to make available every resource at our disposal to vigorously enforce the laws that protect the people who work and reside near the Gulf, the wildlife, the environment and the American taxpayers," Holder said in a statement.

38.     On May 5, 2010, Transocean filed its Form 10-Q for the quarter ended March 31, 2010. In its Form 10-Q, the Company explained that the Departments of Homeland Security and the Interior had begun a joint investigation into the Company and the cause of the incident. In addition, various committees and subcommittees of the United States House of Representatives and Senate have requested Transocean's participation in hearings related to the disaster, and the Company also received a request from the United States Department of Justice to preserve information related to the April 20, 2010 fire, explosion and sinking of the *Horizon*, as well as the oil spill.

39.     In response to this revelation, shares of Transocean's common stock fell $3.06 per share to close at $69.70 per share on May 6, 2010, on high volume.

40.     On May 10, 2010, the extent of Defendants' deception began to surface in a news report published by *The Wall Street Journal* entitled "Rig Owner Had Rising Tally of Accidents." The article explained Transocean's recent problematic safety history and noted that "[n]early *three of every four incidents that triggered federal investigations into safety and other problems on deepwater drilling rigs in the Gulf of Mexico since 2008 have been on rigs operated by Transocean*." Between 2005 and 2007, a "Transocean rig was involved in 13 of the 39 deep-water drilling incidents investigated by the MMS in the Gulf of Mexico, or 33%. That's roughly in line with the percentage of deep-water rigs, 30%, Transocean owned and operated in

the Gulf then, according to data firm RigLogix." However, "[s]ince the merger, *Transocean has accounted for 24 of the 33 incidents investigated by the MMS, or 73%, despite during that time owning fewer than half the Gulf of Mexico rigs operating in more than 3,000 feet of water.*"

41.   As a result of this revelation, the price of Transocean common stock fell an additional $1.67 on May 10, 2010, a day in which the S&P 500 increased 4.3%. In all, as a result of these events and the disclosure of the previously concealed fact that Transocean had been the subject of numerous safety citations and increasing operational and safety investigations, the price of Transocean common stock fell $25.69 per share from April 20, 2010 through May 10, 2010, a decline of almost 28%.

42.   On June 1, 2010, Eric Holder, Attorney General, said that the Justice Department was investigating whether criminal or civil cases were warranted over the spill. Mr. Holder said: "We will make certain that those responsible clean up the mess they have made and restore or replace the natural resources lost or injured in this tragedy." He added, "And we will prosecute to the full extent any violations of the law." The Obama Administration called the spill the "the greatest environmental disaster of its kind in our history," and had earlier said it was President Obama's "solemn pledge" to "bring those responsible to justice." Mr. Holder said his department was looking at laying charges under the Clean Water Act, Oil Pollution Act of 1990, the Migratory Bird Treaty Act and Endangered Species Acts, and other "traditional" criminal statutes. "There are a wide range of possible violations under these statutes, and we will closely examine the actions of those involved in this spill. If we find evidence of illegal behavior, we will be forceful in our response," he said.  The Obama administration already ordered all companies involved − including BP, Transocean and Halliburton − to preserve documents

relating to the incident. Testimony in Congressional hearings has pointed to multiple technical failures before the explosion.

43.    Transocean stock price fell further, to close at $50.04 on June 1, 2010.

44.    The above-referenced statements made by Defendants during the Class Period were each materially false and misleading when made because Defendants failed to disclose the true material facts, including:

(a)    Transocean had recurring and undisclosed safety issues throughout the Class Period.  In fact, as it was disclosed at the end of the Class Period, of the four fires aboard deep-water drilling rigs investigated by the U.S. MMS since 2005, all were operated by Transocean, including a fire that broke out on a brand-new Transocean rig, the *Discoverer Clear Leader*, which knocked out power to the thrusters that keep the rig in position above the well – a serious situation, because if a rig drifts too far it can disconnect from the well and cause a spill. Additionally, in November 2005, Transocean's *Horizon* rig spilled over 200 barrels of an oil-based lubricant into the Gulf of Mexico due to equipment failure and human error.

(b)    Defendants had not resolved the BOP problems and the BOP accidents and occurrences were not "anomalies."  In fact, during the preceding ten years, Transocean had been cited numerous times by both customers and governmental agencies for BOP failures and lax oversight.  For example, as revealed at the end of the Class Period, in 2006, when Transocean's *Discoverer Enterprise* was drilling for BP in over 6,000 feet of water and suffered a leak from the blowout preventer causing 54 barrels of drilling fluid to spill into the Gulf, the MMS said the problem was caused in part by "extended use of [the BOP] without inspection/maintenance."

(c)     Defendants knew that BOPs operating on ultra-deep drilling rigs were inherently unsafe, yet failed to disclose that these "failsafe" mechanisms could not perform the critical "failsafe" function they were intended for.  In fact, Defendants were aware, by virtue of the several industry papers on BOP failures, that the equipment necessary to successfully drill at depths similar to those encountered with the *Horizon* would interfere with the effective operation of Transocean's safety protocols, including the BOP.

(d)     Throughout the Class Period, Transocean did not have the necessary and proper safety protocols in place such that it was just a matter of time before an incident of catastrophic proportions occurred.  Indeed, Transocean knew that drilling was being done at the *Horizon* at depths deeper than permitted by the applicable permits and that drilling at significant depths required specialized equipment that would render Transocean's safety protocols, including the BOP, ineffective.

45.     As a result of Defendants' false and misleading statements and omissions, Transocean common stock traded at inflated levels during the Class Period.  After the above revelations, when it became apparent that Transocean's safety mechanisms and protocols – including the critical BOP – had failed and that Transocean had not only contributed to dozens of fatalities and injuries, and been at the root of a multi-million gallon oil spill, but had also been the subject of numerous and recurring citations and investigations for poor operational and safety performance, the Company's common stock declined.  The price of the Company's common stock declined nearly 28% from its Class Period high.  This drop removed the inflation from Transocean's share price, causing real economic loss to investors who had purchased Transocean common stock during the Class Period.

## C.      The Aftermath of Transocean's Disaster and Disclosure of the Fraud.

46.      Following the catastrophic fire, explosion and oil spill, Louisiana, Alabama, Mississippi and Florida have all declared states of emergency as winds have pushed the oil slick toward and into sensitive marshlands and fishing areas.

47.      While the oil industry has always touted the BOP as a key to its ability to drill offshore without great risk to the environment, Senator Maria Cantwell of Washington, the chairwoman of two key Senate Commerce and Energy Committee subcommittees with oversight over offshore oil drilling, said following the devastating incident that the oil industry's portrayal of this kind of failure as unprecedented does not stand up to examination. "There is clear evidence that the oil industry has been well aware for years of the risk that blowout preventers on offshore rigs could fail," said Cantwell, who has stated that her staff found extensive documentary evidence demonstrating the problems with BOPs. "Despite frequent failures, [the] industry assumed the preventers were fail-safe and, as a result, had no back-up plan for responding to a catastrophe like the one now unfolding in the Gulf."

## VI.      CLASS ACTION ALLEGATIONS

48.      Plaintiff brings this action as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class comprised of all those who purchased the publicly-traded common stock of Transocean during the Class Period and suffered damages thereby (the "Class"). Excluded from the Class are: (i) Defendants; (ii) the immediate family members of Defendant Newman; (iii) any person who was an officer or director of Transocean or any of its parents or subsidiaries during the Class Period and members of their immediate families; (iv) any entity in which any Defendant had a controlling interest during the Class

Period; (v) any parent or subsidiary of Transocean; and (vi) the legal representatives, heirs, successors or assigns of any of the excluded persons or entities specified in this paragraph.

49.     The members of the Class are dispersed throughout the United States and are so numerous that joinder of all members is impracticable.  According to Transocean's Form 10-Q filed with the Securities and Exchange Commission on May 5, 2010, Transocean had 319,933,046 shares of common stock issued and outstanding as of April 27, 2010.  Transocean's common stock was actively traded on the NYSE during the Class Period.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Transocean and/or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

50.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class similarly suffered damages arising out of Defendants' wrongful conduct in violation of federal law that is complained of herein.

51.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

52.     Common questions of law and fact predominate and include whether Defendants: (i) violated the Exchange Act; (ii) omitted and/or misrepresented material facts; (iii) knew or recklessly disregarded that their statements were false; and (iv) artificially inflated the price of Transocean common stock and the extent of and appropriate measure of damages.

53.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## V.    LOSS CAUSATION/ECONOMIC LOSS

54.     As detailed herein, during the Class Period, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Transocean common stock and operated as a fraud or deceit on Class Period purchasers of Transocean common stock by misrepresenting the Company's risks, business and prospects.  Later, when Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Transocean common stock fell precipitously, as the prior artificial inflation came out of the prices over time.  As a result of their purchases of Transocean common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## VII.    APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND FRAUD ON THE MARKET

55.     Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     The omissions and misrepresentations were material;

(c)     The Company's common stock traded in an efficient market;

(d)     The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

(e)     Plaintiff and other members of the Class purchased Transocean common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

56.     At all relevant times, the market for Transocean common stock was efficient for the following reasons, among others:

(a)     As a regulated issuer, Transocean filed periodic public reports with the SEC; and

(b)     Transocean regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

## VIII.   INAPPLICABILITY OF STATUTORY SAFE HARBOR

57.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false or misleading statements and material omissions pled in this Complaint.  Many of the statements alleged to be false and misleading were not specifically identified as "forward-looking statements" when made, and many were statements of historical fact and/or representations about the Company's then-existing condition to which the statutory safe harbor does not apply.

58.     To the extent any statements alleged to be false or misleading herein may be characterized as forward-looking to which the statutory safe harbor applies, (i) those statements were not accompanied by meaningful cautionary statements identifying the important then-

present factors that could cause actual results to differ materially from those in the purportedly forward-looking statements; and (ii) the particular speakers of such statements knew in each case that their statements were false or misleading and/or the statements were authorized and/or approved by an executive officer of the Company who knew that those statements were false or misleading, in each case when such statements were made.

## COUNT I
### For Violation of § 10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

59.    Plaintiff incorporates by reference all allegations set forth above.

60.    During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

61.    Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Transocean common stock during the Class Period.

62.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Transocean common stock. Plaintiff and the Class would not have purchased Transocean common stock at the prices they paid, or at all,

if they had been aware that the market prices had been artificially and falsely inflated by the Defendants' misleading statements.

63.     As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Transocean common stock during the Class Period.

## COUNT II
### For Violation of § 20(a) of the Exchange Act
### Against Defendants Newman and Long

64.     Plaintiff incorporates by reference all allegations set forth in above.

65.     As set forth in Count I above, Defendants Transocean, Newman and Long each violated § 10(b) of the Exchange Act and Rule 10b-5 by their acts and omissions alleged in this Complaint.

66.     Throughout the Class Period, Defendants Newman and Long acted as controlling persons of Transocean within the meaning of § 20(a) of the Exchange Act.  By virtue of their most senior positions and their specific acts described above, Defendants Newman and Long had the power to and did, directly or indirectly, exercise control over Transocean, including the content and dissemination of the various public statements about Transocean which Plaintiff contends are false and/or misleading.  Each of Newman and Long had direct and supervisory responsibility for, and involvement in, the day-to-day operations of the Company and induced the Company to engage in the acts constituting the violations of the federal securities laws alleged herein.  By reason of such conduct, Defendants are liable pursuant to § 20(a) of the Exchange Act.

67.     By virtue of their positions as controlling persons of Transocean, Defendants Newman and Long are liable pursuant to § 20(a) of the Exchange Act to Plaintiff and the

members of the Class who have been damaged as a result of the Company's underlying securities law violations.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and all other members of the Class, prays for judgment as follows:

A.     Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B.     Awarding compensatory damages and interest;

C.     Awarding Plaintiff's reasonable costs, including attorneys' and experts' fees; and

D.     Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury in this action of all issues so triable.

Respectfully submitted,

WAITE, SCHNEIDER, BAYLESS & CHESLEY CO., L.P.A.
Stanley M. Chesley (Ohio Bar # 0000852)
1513 Fourth & Vine Tower
One West Fourth Street
Cincinnati, Ohio 45202
Telephone: (513) 621-0267
Facsimile: (513) 621-0262
E-mail: stanchesley@wsbclaw.com
*Lead Counsel for Plaintiff*

Richard J. Arsenault (LA Bar #02563)
NEBLETT, BEARD & ARSENAULT
Post Office Box 1190
2220 Bonaventure Court
Alexandria, LA 71309-1190
Phone: (318) 487-9874
Facsimile: (318) 561-2591

W. Mark Lanier (TX Bar #11934600)
The Lanier Law Firm
6810 FM 1960 West
Houston, TX 77069
Phone: (713) 659-5200
Facsimile: (713) 659-2204

Camilo Salas, III (LA Bar #11657)
Salas & Co., L.C.
650 Poydras Street
Suite 1650
New Orleans, LA 70130
Phone: (504) 799-3080
Facsimile: (504) 799-3085

Daniel E. Becnel Jr. (LA Bar #24567)
P. O. Drawer H
Reserve, LA 70084
Phone: (985) 536-1186
Facsimile: (985) 536-6445

Jerrold S. Parker, Esq. (NY Bar No. 1894666)
Parker Waichman Alonso, LLP
6 Harbor Park Drive
Port Washington, NY 11050
Phone: (516) 466-6500
Facsimile: (516) 466-6665

BY: _____

Hunter J. Shkolnik (4854)
Rheingold, Valet, Rheingold,
Shkolnik & McCartney, LLP
113 East 37th Street
New York, NY 10016-3042
Phone: (212) 684-1880
Facsimile: (212) 689-8156

34615

**CERTIFICATION OF JOHNSON INVESTMENT COUNSEL, INC.**

1.  The undersigned, as representative of Johnson Investment Counsel, Inc. ("Plaintiff"), reviewed the Class Action Complaint and have authorized the filing of same.

2.  Plaintiff did not purchase the common stock of Transocean Ltd. at the direction of plaintiff's counsel or in order to participate in any private action arising under this title of the federal securities laws.

3.  Plaintiff is willing to serve as class representative and provide testimony at deposition and trial, if necessary.

4.  During the class period, Johnson Investment Counsel, Inc.'s transactions in common stock of Transocean Ltd. consisted of the following:

| Date | Buy or Sell | # of Shares | Price |
|------|-------------|-------------|-------|
|      | SEE ATTACHED |            |       |

5.  During the previous three years prior to the date of this Certification, Plaintiff has not been a lead plaintiff in any securities fraud class action.

6.  Plaintiff will not accept any payment for serving as a class representative beyond its pro rata share of any recovery, except as ordered or approved by the Court with respect to an award for reasonable costs and expenses.

   I declare on behalf of Johnson Investment Counsel, Inc., under penalty of perjury, that the foregoing is true and correct. Executed this _28th_ day of May, 2010.

JOHNSON INVESTMENT COUNSEL. INC.

By _____

34609

| Ticker | Trade Date | TransactionCode | Shares | ExecutedPrice |
|--------|-----------|-----------------|--------|---------------|
| RIG | 8/5/2009 | Purchase | 70.00 | $ 77.02 |
| RIG | 8/5/2009 | Purchase | 50.00 | $ 77.08 |
| RIG | 8/5/2009 | Purchase | 30.00 | $ 77.14 |
| RIG | 8/6/2009 | Sale | 30.00 | $ 77.19 |
| RIG | 8/11/2009 | Purchase | 141.00 | $ 74.71 |
| RIG | 8/14/2009 | Purchase | 30.00 | $ 75.54 |
| RIG | 8/14/2009 | Sale | 48.00 | $ 75.16 |
| RIG | 8/17/2009 | Purchase | 100.00 | $ 72.48 |
| RIG | 8/18/2009 | Sale | 640.00 | $ 72.51 |
| RIG | 8/25/2009 | Purchase | 40.00 | $ 77.72 |
| RIG | 8/25/2009 | Purchase | 50.00 | $ 77.79 |
| RIG | 8/28/2009 | Sale | 2,710.00 | $ 77.82 |
| RIG | 8/31/2009 | Purchase | 30.00 | $ 75.77 |
| RIG | 8/31/2009 | Sale | 34.00 | $ 75.59 |
| RIG | 9/1/2009 | Purchase | 50.00 | $ 74.98 |
| RIG | 9/9/2009 | Purchase | 150.00 | $ 80.64 |
| RIG | 9/10/2009 | Purchase | 130.00 | $ 80.96 |
| RIG | 9/10/2009 | Purchase | 50.00 | $ 81.24 |
| RIG | 9/14/2009 | Purchase | 50.00 | $ 80.64 |
| RIG | 9/15/2009 | Purchase | 100.00 | $ 81.81 |
| RIG | 9/15/2009 | Purchase | 65.00 | $ 82.21 |
| RIG | 9/15/2009 | Purchase | 25.00 | $ 82.65 |
| RIG | 9/16/2009 | Sale | 70.00 | $ 84.32 |
| RIG | 9/17/2009 | Purchase | 80.00 | $ 85.23 |
| RIG | 9/22/2009 | Sale | 109.00 | $ 86.16 |
| RIG | 9/24/2009 | Sale | 100.00 | $ 82.87 |
| RIG | 9/30/2009 | Sale | 125.00 | $ 85.64 |

| Ticker | Trade Date | TransactionCode | Shares | ExecutedPrice |
|---|---|---|---|---|
| RIG | 10/2/2009 | Sale | 94.00 | $ 82.05 |
| RIG | 10/6/2009 | Purchase | 200.00 | $ 85.01 |
| RIG | 10/6/2009 | Purchase | 100.00 | $ 85.74 |
| RIG | 10/6/2009 | Purchase | 25.00 | $ 85.76 |
| RIG | 10/6/2009 | Purchase | 45.00 | $ 85.90 |
| RIG | 10/7/2009 | Purchase | 760.00 | $ 86.89 |
| RIG | 10/7/2009 | Purchase | 300.00 | $ 87.08 |
| RIG | 10/7/2009 | Sale | 25.00 | $ 87.38 |
| RIG | 10/8/2009 | Purchase | 150.00 | $ 88.77 |
| RIG | 10/8/2009 | Purchase | 2,630.00 | $ 91.87 |
| RIG | 10/8/2009 | Sale | 200.00 | $ 89.57 |
| RIG | 10/9/2009 | Purchase | 110.00 | $ 90.39 |
| RIG | 10/9/2009 | Sale | 50.00 | $ 90.38 |
| RIG | 10/9/2009 | Sale | 71.00 | $ 91.14 |
| RIG | 10/15/2009 | Purchase | 100.00 | $ 91.11 |
| RIG | 10/15/2009 | Purchase | 35.00 | $ 91.16 |
| RIG | 10/16/2009 | Purchase | 145.00 | $ 91.13 |
| RIG | 10/21/2009 | Purchase | 800.00 | $ 92.38 |
| RIG | 10/21/2009 | Purchase | 630.00 | $ 94.26 |
| RIG | 10/27/2009 | Sale | 80.00 | $ 87.60 |
| RIG | 10/28/2009 | Purchase | 80.00 | $ 85.85 |
| RIG | 10/28/2009 | Sale | 40.00 | $ 84.03 |
| RIG | 10/29/2009 | Purchase | 130.00 | $ 86.23 |
| RIG | 10/29/2009 | Sale | 80.00 | $ 86.20 |
| RIG | 10/30/2009 | Sale | 140.00 | $ 83.73 |
| RIG | 11/5/2009 | Sale | 60.00 | $ 85.41 |
| RIG | 11/6/2009 | Purchase | 85.00 | $ 85.04 |
| RIG | 11/9/2009 | Purchase | 100.00 | $ 87.80 |
| RIG | 11/9/2009 | Purchase | 260.00 | $ 88.11 |
| RIG | 11/9/2009 | Purchase | 50.00 | $ 88.21 |
| RIG | 11/9/2009 | Purchase | 80.00 | $ 88.55 |
| RIG | 11/10/2009 | Purchase | 30.00 | $ 87.62 |
| RIG | 11/13/2009 | Sale | 120.00 | $ 86.73 |
| RIG | 11/16/2009 | Purchase | 570.00 | $ 90.50 |
| RIG | 11/16/2009 | Sale | 13.00 | $ 90.47 |
| RIG | 11/18/2009 | Sale | 50.00 | $ 88.25 |
| RIG | 11/23/2009 | Purchase | 66.00 | $ 85.51 |
| RIG | 11/25/2009 | Purchase | 150.00 | $ 86.08 |
| RIG | 11/25/2009 | Sale | 100.00 | $ 85.75 |
| RIG | 11/30/2009 | Purchase | 4,100.00 | $ 85.68 |
| RIG | 12/1/2009 | Purchase | 500.00 | $ 87.03 |
| RIG | 12/2/2009 | Purchase | 300.00 | $ 86.34 |
| RIG | 12/4/2009 | Purchase | 530.00 | $ 82.71 |
| RIG | 12/4/2009 | Purchase | 25.00 | $ 83.37 |
| RIG | 12/7/2009 | Purchase | 80.00 | $ 83.15 |
| RIG | 12/7/2009 | Purchase | 50.00 | $ 83.87 |

| Ticker | Trade Date | TransactionCode | Shares | ExecutedPrice |
|--------|-----------|-----------------|--------|---------------|
| RIG | 12/8/2009 Purchase | | 40.00 | $ 81.03 |
| RIG | 12/8/2009 Purchase | | 120.00 | $ 82.00 |
| RIG | 12/8/2009 Sale | | 1,605.00 | $ 79.36 |
| RIG | 12/9/2009 Purchase | | 30.00 | $ 80.59 |
| RIG | 12/9/2009 Sale | | 35.00 | $ 79.34 |
| RIG | 12/11/2009 Purchase | | 50.00 | $ 80.25 |
| RIG | 12/11/2009 Sale | | 50.00 | $ 80.08 |
| RIG | 12/14/2009 Purchase | | 18.00 | $ 81.24 |
| RIG | 12/14/2009 Sale | | 80.00 | $ 81.14 |
| RIG | 12/15/2009 Purchase | | 45.00 | $ 82.47 |
| RIG | 12/15/2009 Purchase | | 1,170.00 | $ 82.92 |
| RIG | 12/15/2009 Sale | | 760.00 | $ 82.89 |
| RIG | 12/18/2009 Sale | | 100.00 | $ 83.32 |
| RIG | 12/21/2009 Purchase | | 200.00 | $ 83.73 |
| RIG | 12/22/2009 Sale | | 1,250.00 | $ 83.99 |
| RIG | 12/23/2009 Purchase | | 2,160.00 | $ 83.19 |
| RIG | 12/23/2009 Purchase | | 300.00 | $ 83.96 |
| RIG | 12/24/2009 Purchase | | 80.00 | $ 84.17 |
| RIG | 12/24/2009 Purchase | | 550.00 | $ 84.26 |
| RIG | 12/28/2009 Purchase | | 30.00 | $ 84.93 |
| RIG | 12/30/2009 Purchase | | 90.00 | $ 83.46 |
| RIG | 12/30/2009 Purchase | | 40.00 | $ 83.49 |
| RIG | 1/7/2010 Purchase | | 50.00 | $ 90.64 |
| RIG | 1/11/2010 Purchase | | 85.00 | $ 92.34 |
| RIG | 1/12/2010 Sale | | 52.00 | $ 91.07 |
| RIG | 1/14/2010 Purchase | | 120.00 | $ 92.26 |
| RIG | 1/19/2010 Purchase | | 75.00 | $ 91.86 |
| RIG | 1/19/2010 Purchase | | 100.00 | $ 93.01 |
| RIG | 1/21/2010 Purchase | | 25.00 | $ 89.37 |
| RIG | 1/22/2010 Purchase | | 25.00 | $ 87.26 |
| RIG | 1/22/2010 Purchase | | 30.00 | $ 87.28 |
| RIG | 1/25/2010 Purchase | | 150.00 | $ 87.06 |
| RIG | 1/26/2010 Sale | | 60.00 | $ 88.23 |
| RIG | 2/1/2010 Sale | | 70.00 | $ 87.29 |
| RIG | 2/3/2010 Purchase | | 140.00 | $ 87.21 |
| RIG | 2/3/2010 Sale | | 100.00 | $ 88.04 |
| RIG | 2/4/2010 Sale | | 40.00 | $ 83.29 |
| RIG | 2/5/2010 Purchase | | 850.00 | $ 81.68 |
| RIG | 2/8/2010 Sale | | 71.00 | $ 85.21 |
| RIG | 2/17/2010 Purchase | | 660.00 | $ 83.44 |
| RIG | 2/18/2010 Purchase | | 345.00 | $ 83.55 |
| RIG | 2/19/2010 Purchase | | 50.00 | $ 85.09 |
| RIG | 2/22/2010 Purchase | | 165.00 | $ 85.02 |
| RIG | 2/22/2010 Purchase | | 190.00 | $ 85.18 |
| RIG | 2/23/2010 Purchase | | 25.00 | $ 84.58 |
| RIG | 2/23/2010 Purchase | | 25.00 | $ 84.63 |

| Ticker | Trade Date | TransactionCode | Shares | ExecutedPrice |
|--------|------------|-----------------|--------|---------------|
| RIG | 2/23/2010 | Purchase | 210.00 | $ 84.69 |
| RIG | 2/23/2010 | Purchase | 80.00 | $ 84.73 |
| RIG | 2/23/2010 | Purchase | 50.00 | $ 84.90 |
| RIG | 2/24/2010 | Purchase | 50.00 | $ 79.96 |
| RIG | 2/24/2010 | Purchase | 350.00 | $ 81.63 |
| RIG | 2/24/2010 | Purchase | 80.00 | $ 81.79 |
| RIG | 2/25/2010 | Purchase | 1,570.00 | $ 78.00 |
| RIG | 2/25/2010 | Purchase | 150.00 | $ 78.01 |
| RIG | 2/25/2010 | Purchase | 12,990.00 | $ 78.02 |
| RIG | 2/25/2010 | Purchase | 25.00 | $ 78.50 |
| RIG | 2/25/2010 | Purchase | 25.00 | $ 78.64 |
| RIG | 2/25/2010 | Purchase | 200.00 | $ 78.71 |
| RIG | 2/26/2010 | Purchase | 90.00 | $ 79.25 |
| RIG | 2/26/2010 | Purchase | 160.00 | $ 79.30 |
| RIG | 2/26/2010 | Purchase | 250.00 | $ 79.89 |
| RIG | 2/26/2010 | Purchase | 375.00 | $ 79.91 |
| RIG | 2/26/2010 | Purchase | 250.00 | $ 80.01 |
| RIG | 3/1/2010 | Purchase | 60.00 | $ 80.14 |
| RIG | 3/1/2010 | Purchase | 18,630.00 | $ 80.14 |
| RIG | 3/1/2010 | Purchase | 540.00 | $ 80.15 |
| RIG | 3/1/2010 | Purchase | 195.00 | $ 80.45 |
| RIG | 3/1/2010 | Purchase | 10,485.00 | $ 80.46 |
| RIG | 3/1/2010 | Purchase | 350.00 | $ 80.49 |
| RIG | 3/1/2010 | Purchase | 130.00 | $ 80.55 |
| RIG | 3/1/2010 | Purchase | 160.00 | $ 81.27 |
| RIG | 3/2/2010 | Purchase | 100.00 | $ 80.88 |
| RIG | 3/2/2010 | Purchase | 1,490.00 | $ 80.94 |
| RIG | 3/2/2010 | Purchase | 1,810.00 | $ 80.94 |
| RIG | 3/2/2010 | Purchase | 150.00 | $ 81.21 |
| RIG | 3/2/2010 | Purchase | 50.00 | $ 81.32 |
| RIG | 3/2/2010 | Purchase | 280.00 | $ 81.64 |
| RIG | 3/2/2010 | Purchase | 35.00 | $ 81.68 |
| RIG | 3/2/2010 | Purchase | 25.00 | $ 81.73 |
| RIG | 3/2/2010 | Purchase | 50.00 | $ 81.82 |
| RIG | 3/2/2010 | Purchase | 920.00 | $ 82.09 |
| RIG | 3/2/2010 | Purchase | 240.00 | $ 82.15 |
| RIG | 3/2/2010 | Sale | 69.00 | $ 81.82 |
| RIG | 3/3/2010 | Purchase | 435.00 | $ 82.62 |
| RIG | 3/3/2010 | Purchase | 120.00 | $ 82.80 |
| RIG | 3/4/2010 | Purchase | 133.00 | $ 82.45 |
| RIG | 3/4/2010 | Purchase | 150.00 | $ 82.57 |
| RIG | 3/4/2010 | Purchase | 500.00 | $ 82.95 |
| RIG | 3/4/2010 | Purchase | 250.00 | $ 83.04 |
| RIG | 3/4/2010 | Purchase | 25.00 | $ 83.06 |
| RIG | 3/5/2010 | Purchase | 110.00 | $ 84.32 |
| RIG | 3/5/2010 | Purchase | 215.00 | $ 84.71 |

| Ticker | Trade Date | TransactionCode | Shares | ExecutedPrice |
|--------|-----------|-----------------|--------|---------------|
| RIG | 3/8/2010 | Purchase | 200.00 | $ 84.90 |
| RIG | 3/8/2010 | Purchase | 200.00 | $ 85.17 |
| RIG | 3/8/2010 | Sale | 60.00 | $ 84.91 |
| RIG | 3/9/2010 | Purchase | 75.00 | $ 84.40 |
| RIG | 3/9/2010 | Purchase | 50.00 | $ 84.64 |
| RIG | 3/9/2010 | Purchase | 50.00 | $ 84.66 |
| RIG | 3/9/2010 | Purchase | 300.00 | $ 84.93 |
| RIG | 3/9/2010 | Purchase | 7,925.00 | $ 85.39 |
| RIG | 3/9/2010 | Purchase | 3,575.00 | $ 85.61 |
| RIG | 3/9/2010 | Purchase | 1,400.00 | $ 85.67 |
| RIG | 3/9/2010 | Purchase | 300.00 | $ 85.77 |
| RIG | 3/10/2010 | Purchase | 40.00 | $ 85.20 |
| RIG | 3/10/2010 | Sale | 69.00 | $ 85.87 |
| RIG | 3/11/2010 | Purchase | 1,275.00 | $ 85.24 |
| RIG | 3/12/2010 | Purchase | 1,400.00 | $ 85.83 |
| RIG | 3/12/2010 | Purchase | 141.00 | $ 85.86 |
| RIG | 3/12/2010 | Sale | 57.00 | $ 85.54 |
| RIG | 3/15/2010 | Purchase | 80.00 | $ 84.16 |
| RIG | 3/15/2010 | Purchase | 65.00 | $ 84.17 |
| RIG | 3/15/2010 | Purchase | 80.00 | $ 84.75 |
| RIG | 3/17/2010 | Purchase | 350.00 | $ 85.09 |
| RIG | 3/17/2010 | Purchase | 20.00 | $ 85.44 |
| RIG | 3/17/2010 | Purchase | 70.00 | $ 86.21 |
| RIG | 3/17/2010 | Purchase | 36.00 | $ 86.28 |
| RIG | 3/17/2010 | Purchase | 25.00 | $ 86.41 |
| RIG | 3/17/2010 | Purchase | 325.00 | $ 86.46 |
| RIG | 3/19/2010 | Purchase | 50.00 | $ 81.73 |
| RIG | 3/19/2010 | Purchase | 475.00 | $ 81.91 |
| RIG | 3/19/2010 | Sale | 47.00 | $ 81.86 |
| RIG | 3/22/2010 | Purchase | 1,390.00 | $ 81.48 |
| RIG | 3/22/2010 | Purchase | 75.00 | $ 81.52 |
| RIG | 3/22/2010 | Purchase | 46.00 | $ 81.55 |
| RIG | 3/22/2010 | Purchase | 45.00 | $ 81.85 |
| RIG | 3/22/2010 | Purchase | 15.00 | $ 82.00 |
| RIG | 3/23/2010 | Purchase | 50.00 | $ 82.27 |
| RIG | 3/23/2010 | Purchase | 150.00 | $ 82.75 |
| RIG | 3/24/2010 | Purchase | 70.00 | $ 82.65 |
| RIG | 3/25/2010 | Purchase | 70.00 | $ 81.93 |
| RIG | 3/25/2010 | Purchase | 555.00 | $ 82.12 |
| RIG | 3/25/2010 | Purchase | 150.00 | $ 82.72 |
| RIG | 3/29/2010 | Purchase | 35.00 | $ 83.36 |
| RIG | 3/30/2010 | Purchase | 60.00 | $ 83.26 |
| RIG | 3/30/2010 | Purchase | 120.00 | $ 83.65 |
| RIG | 3/30/2010 | Purchase | 120.00 | $ 83.66 |
| RIG | 3/30/2010 | Purchase | 125.00 | $ 83.71 |
| RIG | 3/30/2010 | Purchase | 75.00 | $ 83.98 |

| Ticker | Trade Date | TransactionCode | Shares | ExecutedPrice |
|---|---|---|---|---|
| RIG | 3/31/2010 Purchase | | 100.00 | $ 85.94 |
| RIG | 3/31/2010 Purchase | | 125.00 | $ 86.19 |
| RIG | 3/31/2010 Purchase | | 80.00 | $ 86.40 |
| RIG | 3/31/2010 Purchase | | 75.00 | $ 86.61 |
| RIG | 4/1/2010 Purchase | | 50.00 | $ 87.70 |
| RIG | 4/1/2010 Purchase | | 200.00 | $ 88.61 |
| RIG | 4/1/2010 Purchase | | 120.00 | $ 88.69 |
| RIG | 4/1/2010 Purchase | | 130.00 | $ 89.35 |
| RIG | 4/5/2010 Purchase | | 60.00 | $ 89.28 |
| RIG | 4/6/2010 Purchase | | 75.00 | $ 88.36 |
| RIG | 4/6/2010 Purchase | | 60.00 | $ 88.76 |
| RIG | 4/13/2010 Purchase | | 200.00 | $ 85.26 |
| RIG | 4/14/2010 Purchase | | 45.00 | $ 86.75 |
| RIG | 4/14/2010 Purchase | | 44.00 | $ 87.13 |
| RIG | 4/14/2010 Purchase | | 200.00 | $ 87.21 |
| RIG | 4/14/2010 Purchase | | 97.00 | $ 87.34 |
| RIG | 4/14/2010 Purchase | | 25.00 | $ 88.09 |
| RIG | 4/15/2010 Purchase | | 860.00 | $ 88.26 |
| RIG | 4/15/2010 Purchase | | 100.00 | $ 88.30 |
| RIG | 4/20/2010 Purchase | | 25.00 | $ 91.82 |
| RIG | 4/20/2010 Purchase | | 30.00 | $ 91.87 |
| RIG | 4/26/2010 Purchase | | 150.00 | $ 88.07 |
| RIG | 4/28/2010 Purchase | | 200.00 | $ 84.65 |
| RIG | 4/28/2010 Purchase | | 100.00 | $ 84.91 |
| RIG | 4/29/2010 Purchase | | 50.00 | $ 79.37 |
| RIG | 4/29/2010 Purchase | | 30.00 | $ 80.03 |
| RIG | 4/29/2010 Purchase | | 120.00 | $ 82.24 |
| RIG | 4/29/2010 Purchase | | 170.00 | $ 82.75 |
| RIG | 4/29/2010 Sale | | 1,081.00 | $ 78.13 |
| RIG | 4/30/2010 Purchase | | 660.00 | $ 72.49 |
| RIG | 4/30/2010 Purchase | | 250.00 | $ 72.53 |
| RIG | 4/30/2010 Purchase | | 350.00 | $ 72.96 |
| RIG | 4/30/2010 Purchase | | 1,000.00 | $ 73.42 |
| RIG | 4/30/2010 Purchase | | 175.00 | $ 73.77 |
| RIG | 5/3/2010 Purchase | | 275.00 | $ 74.60 |
| RIG | 5/4/2010 Purchase | | 40.00 | $ 71.26 |
| RIG | 5/4/2010 Purchase | | 605.00 | $ 72.33 |
| RIG | 5/5/2010 Purchase | | 100.00 | $ 72.75 |
| RIG | 5/5/2010 Purchase | | 270.00 | $ 74.38 |
| RIG | 5/6/2010 Purchase | | 400.00 | $ 69.66 |
| RIG | 5/6/2010 Purchase | | 100.00 | $ 69.70 |